Allen HOGAN, Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 01–3073.

United States Court of Appeals,
Sixth Circuit.

July 31, 2002.

Before GUY and BATCHELDER,
Circuit Judges, and COHN, District
Judge.*

* The Honorable Avern Cohn, Senior United States District Judge for the Eastern District

AVERN COHN, Senior District Judge.

## I. Introduction

This is a tort case under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b) and § 2671 in which plaintiff-appellant Allen Hogan (Hogan) asserts that defendant-appellee the United States of America (the government) sold him radioactive scrap metal, causing him to suffer personal injury and property damage. Hogan appeals from the district court's decision granting the government's motion to dismiss on the grounds that Hogan's claims are barred by FTCA's two-year statute of limitations for filing an administrative claim. The district court also dismissed the claim brought by Hogan's daughter, Erin, for lack of jurisdiction, which Hogan has not appealed. We affirm in part and reverse in part, finding that Hogan's personal injury claim is time-barred, his property damage claim, although statutorily barred, is subject to equitable tolling.

## II. Background

### A.

Hogan owns and operates a scrap yard in Mansfield, Ohio, called Autojumble, where he buys and collects scrap metal and resells it to recycling centers. Autojumble is situated on a 27–acre plot. In March 1994, Hogan purchased approximately 2,900 pounds of material marked scrap magnesium metal from the Columbus, Ohio Defense Reutilization and Marketing Office (DRMO), a government organization that disposes, through sale or otherwise, of excess new and used property received from military services. Hogan was not informed that the scrap metal was potentially radioactive, but he does not claim that the DRMO knowingly sold him radioactive material.

After unloading the scrap metal into various piles, Hogan and his daughter began sorting through the material, extracting aluminum and magnesium pieces to be taken to a recycling center. The recycling center, however, could not identify the composition of a large portion of the material and refused to purchase it. Hogan then put some of the unknown material inside some automobiles he intended to sell after having them crushed. He also buried and burned some of the material in a 55 gallon drum located in a driveway. In 1994 and 1995, Hogan sought treatment for a deviated septum and other nasal problems.

In October or November of 1996, Hogan sold some of the automobiles containing the unknown material to a scrap yard to be crushed. The crushed automobiles were then sold to a buyer in Canton, Ohio. Upon arrival at the buyer's premises, the crushed automobiles were passed under an antenna that detected radioactive material. The buyer returned the automobiles to the scrap yard, who in turn contacted Hogan.

Hogan, apparently realizing that the unknown material in the automobiles purchased from the DRMO was the likely source of the radioactivity, contacted the DRMO in November 1996, who told him to submit something in writing. Hogan complied with the request and submitted a letter on November 22, 1996 requesting the DRMO to "resolve this situation."

In December 1996, Hogan had a phone conversation with Ben Wilmoth (Wilmoth), a laser safety officer at Wright–Patterson Air Force Base and a civilian employee of the United States Air Force who specializes in radioactive materials.

of Michigan, sitting by designation.

On December 10, 1996, Wilmoth visited Hogan's premises to conduct a scoping survey to detect radioactivity. At this time, Hogan was informed that the material was magnesium-thorium (mag-thor) and according to Wilmoth, Hogan expressed concerns for his and his daughter's health in being exposed to it and particularly burning it. Wilmoth said that mag-thor was an internal hazard and asked Hogan if he had inhaled any of the fumes; Hogan replied that he did not.

Wilmoth also told Hogan that it would be impossible to remove all of the pieces because many were "small particle size." However, Wilmoth admitted that at the time of his visit, he did not know "what actions, if any, the Air Force would take" regarding cleanup. Wilmoth did tell Hogan to contact the Ohio Department of Health or the Nuclear Regulatory Commission if he had any further concerns regarding his health and safety.

On January 17–22, 1997, a team of United States Air Force personnel from Brooks Air Force Base (the Brooks team), consisting of Lieutenant Nicolas Bates (Bates), Master Sergeant Richard Howell (Howell), and Staff Sergeant Roddray Walker, conducted a radiological survey of Hogan's property. Larry Glidewell (Glidewell), a public relations officer from Wright–Patterson Air Force Base, was also present.

Hogan expressed concerns to Howell that burning the mag-thor may have caused his sinus problems and asked Bates if burning the mag-thor was dangerous. According to an addendum to Hogan's administrative claim, "the expression in Lt. Bates eyes when I told him I burned the mag-thor told me I was in trouble."

On January 7 and 22, 1997, Hogan called Major Walter Roberts (Roberts) a United States Air Force environmental attorney from Brooks Air Force Base and inquired about the health risks from exposure to mag-thor.

In March of 1997, Carol Young (Young) a contracting officer at the Wright–Patterson Air Force Base, visited Hogan's premises to prepare for a more extensive cleanup during the summer months. Young testified that she never told Hogan that only part of the mag-thor would be removed. Indeed, Young testified that soil samples would have been taken to determine whether the soil contained mag-thor and if so, at what levels. If the soil was contaminated, it would then be determined whether or not to remove the contaminated soil. The soil removal process is known as phase two.

Beginning in June of 1997, the government contracted with a third-party, OHM Corps Environmental Services, who performed a 3½ week cleanup on Hogan's premises. On June 9, 1997, the Air Force issued a News Release regarding the cleanup efforts, stating in part:

Earlier this year, Air Force personnel conducted an initial site survey collecting most of the estimated 87 pounds of thorium at the Autojumble Scrapyard. The material is now being stored at the Wright–Patterson Air Force Base. Wright–Patterson's environmental office was asked by Air Force officials for assistance in surveying and removing any remaining thorium.

The Survey will take approximately three weeks to complete. All pieces of throium found during the survey will be packaged and shipped to Wright–Patterson. It will then be shipped to a licensed radiation waste disposal site for burial. Soil samples from the Autojumble site will be collected and shipped to a private laboratory for analysis. Results of the analysis will be available in one or two months. **Based on the results of**

the analysis, any soil containing thorium at the Autojumble will be removed.

J.A. at 97–98 (emphasis added).

On June 10, 1997, a newspaper article appeared in *The News–Messenger*, the local newspaper in Mansfield, Ohio, entitled "Radioactive metal found: Air Force mistakenly sold scrap material, assisting with cleanup." The article reports Glidewell as saying "Soil samples will be collected for a private laboratory. Results will be available in one to two months; if any soil is shown to contain thorium, it will be removed." J.A. at 89.

On June 11, 1997, another newspaper article appeared in *The News–Messenger* entitled "Thorium danger is not long-term exposure," and reports that "workers from the OHM Corps of Environmental Services of Fidlay are going through the Autojumble to identify and recover whatever radioactive material is left."

On August 29, 1997, the OHM released its "Final Report for the Radiological Survey and Decontamination of the Autojumble Facility in Mansfield, Ohio." The report states in part that "[t]he results provided by the laboratory analysis indicate that soil excavation and disposal will not be required at the Autojumble facility in order to comply with the USNRC limits for thorium contamination in soil (10 pCi/g)." J.A. at 61. Thus, the cleanup efforts did not include decontaminating the soil, but simply the removal of all visible pieces of mag-thor. In other words, the cleanup did not advance to phase two.

On September 5, 1997, the government, through Robert A. Capell, Colonel and Chief of the Bioenvironmental Engineering Services Division, wrote Hogan explaining the results of the "radiological survey, analysis, and the magnesium-thorium metal removal," stating in part:

At your request, the Air Force performed additional soil analyses and conducted the removal of magnesium thorium scrap. Sample analyses concluded that the soil does not contain thorium contamination that would warrant a removal action. All magnesium-thorium metal found was removed. **Scattered magnesium thorium fragments which remain in the soil do not pose a health hazard and therefore no practical risk.**[1]

On September 9, 1997, the Air Force issued another press release, stating in part:

The Air Force contracted OHM Environmental to conduct a second survey and to remove any remaining pieces of metal that might contain magnesium-thorium. The survey and removal process occurred in June and July. **Soil analyses show that no further removal action is warranted** and that scattered fragments that may remain in the soil pose no health risk.

J.A. at 103 (emphasis added).

The Air Force did, however, provide Hogan with a barrel in which to place any additional pieces of mag-thor that might resurface through soil excavation or erosion. Over the years, Hogan has removed additional pieces of mag-thor from his premises.

**B.**

**1.**

Hogan filed an administrative claim with the Air Force on January 28, 1999, seeking

1. This paper is attached as Ex. 16 of the government's motion to dismiss for lack of subject matter jurisdiction. It is not part of the joint appendix, but is part of the district court record.

$115,000 in property damage and $1.2 million for personal injuries. Hogan did not list his daughter as a claimant, but referenced her in an addendum.

Hogan filed a second administrative claim on April 9, 1999, seeking $10 million in nuisance damages and again did not list his daughter as a claimant.

The Air Force denied the claims on June 21, 1999 based on his failure to file an administrative claim within the two-year statute of limitations.

### 2.

Hogan and his daughter then filed suit against the government under the FTCA. The government filed a motion to dismiss on the grounds that Hogan's claim was untimely and that the statute of limitations was jurisdictional. On September 25, 2000, the district court conducted an evidentiary hearing on the statute of limitations issue, at which it heard testimony on the issue of when Hogan's claims for personal injury and property damage accrued.

Following the hearing, the district court issued an order holding that FTCA's statute of limitations was not jurisdictional, but rather a defense, and directed the government to file an answer to Hogan's complaint. The government filed an answer, rasing the statute of limitations as an affirmative defense. The district court also informed the parties that it would consider the September 25, 2000 hearing to be a "trial" and gave the parties an opportunity to submit additional evidence on the statute of limitations issue. Hogan submitted only the affidavit of his brother.

The district court dismissed Hogan's claims as time-barred. The district court found that Hogan knew, or should have known, of the alleged property damage and nuisance by December 10, 1996, when Wilmoth visited the premises, more than

two years before he filed his administrative claim. The district court also found that Hogan knew, or should have known, of any alleged personal injury at the latest by January 21, 1997, also more than two years before he filed his administrative claim. The district court further held that the statute of limitations would not be equitably tolled.

The district court also dismissed Hogan's daughter's claim without prejudice for lack of jurisdiction because she had not filed an administrative claim. Hogan then appealed.

### III. Standard of Review

Ordinarily, a district court's decision granting a motion to dismiss based on the statute of limitations would be reviewed *de novo, see Tolbert v. State of Ohio Dept. of Transp.,* 172 F.3d 934, 938 (6th Cir.1999). Here, the district court's decision essentially followed a bench trial, at which it heard testimony and other evidence. Its decision therefore contains findings of fact and conclusions of law. In a bench trial, a district court's findings of fact are reviewed under the clearly erroneous standard of review. *Kline v. Tennessee Valley Authority,* 128 F.3d 337, 341 (6th Cir. 1997). A finding of fact will only be clearly erroneous when, although there may be some evidence to support the finding, the "reviewing court is left with the definite and firm conviction that a mistake has been committed." *Id.* Conclusions of law are reviewed *de novo. Id.*

### IV. Analysis

#### A. The Applicable Law

▇ The parties do not dispute the applicable law regarding the statute of limitations in a FTCA action, as set forth under 28 U.S.C. § 2401(b):

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues. . . .

Because the statute of limitations in an FTCA action is an affirmative defense, the burden is on the government to show that the statute of limitations has run. If the government meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations. *See Drazan v. United States,* 762 F.2d 56, 60 (7th Cir.1985).

The "discovery rule" applies in determining when a claim "accrues" under the FTCA. That is, a plaintiff's claim "accrues" when the plaintiff knew or should have known of the injury and its cause. *See United States v. Kubrick,* 444 U.S. 111, 117–24, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). A plaintiff must file an administrative claim within two years of the date when the claim accrues.

Here, Hogan filed his first administrative claim for personal injury and property damage on January 28, 1999. He filed a second claim on April 9, 1999 for nuisance. His claims are therefore timely if they accrued on or after January 28, 1997, or April 9, 1997. Hogan's claims for personal injury and property damage will be separately considered.

### B. Personal Injury Claim

The district court found that Hogan's personal injury claim accrued at the latest on January 21, 1997 during the visit by the Brooks team. Although the district court found that Wilmoth had told Hogan of the potential health risks associated with exposure to mag-thor during his December 10, 1996 visit, the district court also explained:

the evidence that best illustrates that Hogan knew or should have known of the potential for injury comes from a conversation between Hogan and Lieutenant Bates. According to Bates, Hogan stated he had burned some of the mag-thor and that this had destroyed his sinuses. Hogan's account of this conversation is even more telling, Hogan states that when he told Bates that he had burned some of the mag-thor, the "expression in Lt. Bates['s] eyes . . . told me I was in trouble.

J.A. at 20–21. While Hogan testified that he did not know what Bates's facial expression meant, he admitted that his expression aroused concerns in the potential effects of exposure to mag-thor.

Hogan argues, as he did before the district court, that no one told him about the harmful health effects of exposure to mag-thor and that he was not aware of any health risks until June of 1997, when he read the above described newspaper articles. He also stated in his affidavit that he was not aware of any risks until he found a book indicating that burning mag-thor could be harmful.

The district court rejected this evidence, stating:

the court finds that Hogan knew or should have known of the possibility of injury on or before January 21, 1997. Hogan knew that he had nasal and sinus problems as early as 1993. Then, in November, 1996, he learned that radioactive material was present on his property. A month later, Mr. Wilmoth explained to Hogan that mag-thor is harmful because it is an internal hazard. Hogan denied that Wilmoth told him of the effects of burning mag-thor. However, the court finds Wilmoth to be a more credible witness. Thus, Hogan knew on December 10, 1996 that the [sic] he may have suffered an injury from burning the mag-thor.

*Id.*

The district court also noted that three members of the Brooks team testified that

Hogan asked about any health risks associated with mag-thor and that Hogan had mentioned his sinus problems. There is also testimony from Roberts, who had phone conversations with Hogan on January 7 and January 22, 1997, during which Hogan expressed concerns about his health and exposure to mag-thor.

We agree with the district court that Hogan knew or should have known of the health risks associated with his exposure to mag-thor by December 10, 1996, and at the latest by January 21, 1997 based on his conversations and especially his stated concern in his addendum to his administrative claim. The district court's finding that Wilmoth's testimony was more credible as to his conversation with Hogan regarding the health risks of mag-thor is not clearly erroneous. Indeed, it appears that Hogan was well aware early on that his exposure to mag-thor presented a potential health risk and raised this concern with government officials. Because Hogan did not file a claim until January 28, 1999, his personal injury claim is therefore time-barred.

### C. Property Damage Claim

#### 1.

■ The district court found that Hogan's property damage claim accrued on December 10, 1996, when Wilmoth first visited Hogan's premises because at that time Hogan knew, or should have known that the presence of mag-thor on his premises could affect its value. Hogan, however, argues that his claim did not accrue until the government made its final analysis of Hogan's premises and completed its "final cleanup." The district court's explanation, in which the same arguments Hogan makes here were addressed, bears repeating:

First, the court finds that it was not reasonable for Hogan to believe that the

Air Force would be able to remove all of the mag-thor material from his property. Hogan testified that he had spread the scrap metal from the DRMO all over his property and that he did not know which pieces of metal were radioactive and which were not. Hogan also stated that some of the pieces of the scrap metal were the size of a dime or the size of a thumbnail. The court concludes that Hogan could not reasonably believe that the Air Force would be able to remove every piece of metal, especially when it had been widely scattered throughout the property and some of it was beneath the surface.

Second, the court concludes that Wilmoth has given an accurate account of the December 10, 1996 meeting, in which he told Hogan that it would be impossible to remove all of the mag-thor pieces from his property. At this meeting, Wilmoth explained to Hogan that because the material was so widely scattered and some of it was in such small "particle" size, that it would be impossible to remove all of it from his property. Wilmoth also explained that it would be impossible to detect a piece of the metal if it was "covered with just a little bit of soil, an inch or more."

Hogan claims that at the initial meeting, Wilmoth told him that the government would cleanup the mag-thor, which he interpreted as meaning the government would cleanup *all* of the mag-thor. However, in weighing the testimony, the court finds Wilmoth's account of the conversation to be more accurate. For additional support, Hogan presented the affidavit of his brother, Theodore Hogan. In this affidavit, Theodore Hogan stated that his brother had believed that the Air Force would remove all of the mag-thor from his property and that it was not until June 10, 1997 that he

learned otherwise. This testimony does not, however, change the court's conclusion that Mr. Wilmoth gave an accurate account of the December 10th meeting. Wilmoth's testimony, coupled with the court's conclusion that a reasonable person could not believe that the government would be able to detect and remove all of the mag-thor pieces, leads to the conclusion that on or before December 10, 1996, Hogan knew or should have known that his property may have been damaged. Therefore, Hogan's property damage claim must have been filed two years from that date, which would be December 10, 1998. Hogan did not file his administrative claim until January 27, 1999 and, therefore, his claim is time-barred.

J.A. at 23–24.

Wilmoth also testified that during his initial visit in December 10, 1996, Hogan told him that he wanted the Air Force to do three things: 1) admit that they were responsible for this incident, 2) remove the mag-thor, and 3) compensate him financially for his losses. However, as noted above, Wilmoth also testified that he did not know the extent to which the government would cleanup Hogan's premises, which included removal of the mag-thor.

Contrary to the district court's finding, we find that the record establishes that it was reasonable for Hogan to believe that the government would remove all of the mag-thor from his premises and the district court clearly erred in finding otherwise. Although admittedly some of the pieces of mag-thor were small, the fact that a soil analysis was being done left open the possibility that *all* of the mag-thor could be removed. This is consistent with the government's press releases and newspaper article quoting Glidewell as saying that all mag-thor was going to be removed, that soil samples would be taken, and that any soil containing mag-thor would be removed. Although the district court relied on Glidewell's testimony that he meant that only the mag-thor which could be seen would be removed, Glidewell's testimony is suspect. He was not involved in the final cleanup efforts, and as of June 1997, when the newspaper articles appeared, it was not yet known whether soil containing pieces of mag-thor would be removed based on the soil analysis. It was not until the OHM issued its final report in August of 1997 that it became known to the government that there would be no soil removal and that mag-thor would remain on Hogan's premises. Hogan did not know of this until September 1997, when the government informed him by letter and issued a press release stating that no further cleanup actions would be taken. At that point, Hogan first became aware that some of the mag-thor, which he reasonably believed would be, or could be, completely removed from his premises, was going to remain.

However, even though we disagree with the district court's finding that it was not reasonable for Hogan to believe all of the mag-thor would be removed from his premises, this finding does not affect the accrual of the statute of limitations for his property damage claim. Because the test is when Hogan knew or should have known of his injury and its cause, we agree with the district court that Hogan's property damage claim accrued on December 10, 1996, because he clearly knew at that time of his "injury" for his property damage claim—that his property contained mag-thor—and its "cause"—that it was from metal sold to him by the government. Hogan's belief regarding the government's cleanup efforts, although not relevant for purposes of determining whether Hogan's claim is statutorily barred, is however rele-

vant to whether the statute should be equitably tolled, as will be explained below.

### 2.

In *Glarner v. United States*, 30 F.3d 697 (6th Cir.1994), a panel of this Court held that the statute of limitations under the FTCA was subject to equitable tolling, which requires a consideration of the following factors:[2] "(1) lack of actual notice of the filing requirements, (2) lack of constructive knowledge of the filing requirement, (3) diligence in pursuing one's rights, (4) absence of prejudice to the defendant, and (5) a plaintiff's reasonableness in remaining ignorant of the notice requirement." *Glarner*, 30 F.3d at 702.

Considering the factors in *Glarner*, we find that Hogan's property damage claim is subject to equitable tolling. First, there is no evidence that Hogan actually or constructively knew of the filing requirement. With respect to Hogan's diligence in pursuing his rights and in remaining ignorant of the need to file a claim, because it was reasonable for Hogan to believe that all of the mag-thor would be removed in light of the totality of the government's conduct with respect to the cleanup efforts at Hogan's premises, we find that Hogan diligently pursued his rights. First, Wilmoth testified that he did not know what efforts the government would take regarding cleanup at the premises, and indeed he could not have known what steps would be taken because the government had not yet begun cleanup efforts. Second, the government, through press releases and newspaper articles, gave the impression that all of the mag-thor was going to be completely cleaned up from the premises. It was not until September of 1997 when Hogan, or the public, knew otherwise. Moreover, there is no evidence that the government would be prejudiced if Hogan's claim goes forward, other that the usual prejudice resulting from being subject to suit.

We therefore find that the statute is equitably tolled on Hogan's property damage claim until September of 1997,[3] when the government finally informed Hogan that no further cleanup would be conducted. Thus, Hogan's claim filed in January of 1999 was timely based on equitable tolling.[4]

## V. Conclusion

The district court correctly found that Hogan's personal injury and property damage claims are time-barred. However, the district court erred in finding that Hogan's property damage claim, although time-barred, was not subject to equitable tolling. Accordingly, the district court's

---

2. The district court did not consider these factors, but rather simply found that because Hogan had not shown that the government induced or tricked him into letting the statute of limitations expire, his claims were not subject to equitable tolling.

3. Although we have found that Hogan's property damage claim is subject to equitable tolling, we do not find that his personal injury claim should also be equitably tolled even though it was filed within days after the statute of limitations expired. The considerations which led us to toll the property damage claim—the extent of the government's cleanup efforts of Hogan's premises—are not present with respect to Hogan's personal injury claim. Rather, as discussed above, Hogan clearly knew of his injury and its cause as to his personal injury claim by January 1997.

4. Hogan also filed an administrative claim for nuisance. The district court considered this claim separately, found that it also accrued on December 10, 1996, and concluded that it was also untimely. We decline to address Hogan's nuisance claim as a separate claim in light of finding that Hogan has a viable claim for property damage. The two claims are essentially the same in terms of the elements of proof and damages. *See* Restatement (Second) of Torts § 821D, § 89 (1965).

decision is **AFFIRMED IN PART, RE-VERSED IN PART** and **REMANDED** for further proceedings consistent with this opinion.